**SEABOARD COAST LINE RAILROAD COMPANY, Petitioner,**

v.

**William Thaddeus COLEMAN, Jr., Secretary of Transportation, and the United States Coast Guard, Department of Transportation, Respondents.**

No. 75–2671.

United States Court of Appeals, Fifth Circuit.

Nov. 11, 1977.

---

Malcolm Maclean, Charles Edwards, Savannah, Ga., John W. Weldon, Edward A. Charron, Jacksonville, Fla., for petitioner.

William T. Coleman, Jr., Sec. of Transportation, U. S. Dept. of Transp., Rex E. Lee, Asst. Atty. Gen., William Kanter, Atty., Eloise Davies, Ronald R. Glanz, Appellate Sec., Civil Div., Dept. of Justice, Washington, D. C., for respondent.

Before BROWN, Chief Judge, THORNBERRY, Circuit Judge, and MILLER,* Associate Judge.

JOHN R. BROWN, Chief Judge:

This bridge-over-troubled-waters, or more accurately, this troubled-bridge (owner)-over-navigable waters case arises under the Truman-Hobbs Act, 33 U.S.C.A. §§ 511–524, for review of an order of the United States Coast Guard disallowing Government· participation in the cost of permanently relocating a railroad communication wireline. We reverse.

### The Past Is Prologue

This case involving much principle with little principal[1] turns on a good deal of history. The then Senator (later President) Truman and Congressman Hobbs of Alabama, with a tenacity seldom equalled, were determined to eliminate what they regarded as an overbearing burden on the even then troubled railroads. This burden resulted from the Supreme Court's *Union Bridge*[2] holding that under the traditional Corps of Engineers' permit for the building of a bridge over navigable waters, a subsequent order to relocate or alter the bridge[3]

---

* Of the U.S. Court of Customs and Patent Appeals sitting by designation.

1. Of a total cost of approximately two and a quarter million dollars, the parties square off over $19,760.21 covering relocation of a communication wireline.

2. *Union Bridge Co. v. United States,* 1907, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523.

3. The General Bridge Act of March 23, 1906 (34 Stat. 84) authorized the Secretary of War to require alteration of a bridge which he determined to be an unreasonable obstruction to navigation. Pursuant to this Act, the cost of the alteration would be borne entirely by the bridge owner.

did not amount to a Fifth Amendment taking and therefore the entire cost of the project was to be borne by the railroad.

The legislation, which quite understandably came to be known as the Truman-Hobbs Act, would impose on the Government the total cost incurred in the interest of navigation, with suitable apportionment of cost to the railroad covering special improvements to the benefit of the railroad, the remaining useful life of the facility, and the like.

Passed by the Congress on August 4, 1939, 84 Cong.Rec. 11016 (1939), it was returned by the President without his approval on August 11, 1939. 84 Cong.Rec. 11174–11175. In the next session, apparently after a mistaken belief on the part of its managers that the revised bill would pass the earlier objections of the President, a similar bill was passed by the Congress, 86 Cong.Rec. 4229, 7252, 7259, only to meet again the President's veto on June 10, 1940.[4] The Congress, overrode the veto and the bill was enacted on June 21, 1940.

Under the provisions of the 1940 Act, *as amended,* 33 U.S.C.A. § 511 *et seq.* (1970), whenever the Secretary of Transportation issues an order requiring alteration of a bridge over navigable waters to remove an

obstruction to navigation, the bridge owner bears only that portion of the cost which represents direct and special benefits accruing to the bridge owner as a result of the alteration, and the Federal Government bears the remaining cost.

On order of the Secretary SCL[5] was required to alter its bridge over the Chattahoochee River to remove an obstruction to navigation. A new bridge was built to conform with orders of the Secretary and the old bridge was removed. The costs of the project were apportioned in accordance with the Act. The only disagreement between the Coast Guard and SCL—and the issue before us now—concerns who should pay the major cost of relocating a wireline that was disturbed in completing the project.

### Sailing Without Chart Or Compass

At the outset, we must point out the difficulties encountered with this case. Proceedings relating to the administration of the Truman-Hobbs Act are exempt from the provisions of the Administrative Procedure Act.[6] The Secretary of Transportation issues findings of fact and our review is limited to questions of law, the findings of the Secretary[7] being conclusive if supported by substantial evidence.

---

**4.** 86 Cong.Rec. 7874, 7875. In returning the bill without approval, President Roosevelt noted that "[t]he provisions of the bill are substantially the same as those contained in S. 1989 from which I withheld my approval on August 11, 1939." Alteration Of Certain Bridges Over Navigable Waters Of The United States, Message From The President Of The United States, H.R. Doc. No. 834, 76th Cong., 3d Sess. 1–2 (1940). In the President's opinion, the bill would impose heavy financial liabilities upon the Federal Government that were unnecessary, especially in light of Supreme Court decisions. *Id.* at 2.

**5.** The original order was issued to Atlantic Coast Line Railroad Company. App. at 3. In 1967, the Atlantic Coast Line merged with Seaboard Air Line and became Seaboard Coast Line Railroad Company.

**6.** *§ 524. Applicability of Administrative Procedure Act*

In the administration of this Act, hearings and other procedures shall be exempted from

the provisions of the Administrative Procedure Act, except as to the requirements of section 1002 of Title 5.

**7.** *§ 520. Review of findings and orders*

Any order made or issued under section 516 of this title may be reviewed by the court of appeals for any judicial circuit in which the bridge in question is wholly or partly located, if a petition for such review is filed within three months after the date such order is issued. The judgment of any such court shall be final except that it shall be subject to review by the Supreme Court of the United States upon certification or certiorari, in the manner provided in sections 346 and 347 of Title 28. The review by such Court shall be limited to questions of law, and the findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive. Upon such review, such Court shall have power to affirm or, if the order is not in accordance with law, to modify or to reverse the order, with or without remanding the case for a rehearing as justice may require.

This case comes to us on a record that consists of correspondence between the parties, charts and graphs, and attorneys' memoranda. Reconstructing the chain of events from these sources was admittedly no easy task. Aside from the frailties [8] of the record, this is a case of first impression. We enter this decision without the guidance of time-honored precedent.

■ The parties attempted to approach this case wholly on the basis of whether these subsequent letters between the engineers and the railroad and the findings of the law officer are the record. In spite of the fact that there was no formal adjudicatory hearing, the scope of our review is governed by the substantial evidence standard. *See Florida Peach Growers Association v. United States Department of Labor,* 5 Cir., 1974, 489 F.2d 120; *but see Citizens to Preserve Overton Park, Inc. v. Volpe,* 1971, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (refusing to apply the substantial evidence test in review of informal decision making). Section 520 of the Act (see note 7, *supra*) mandates the substantial evidence test. Thus, although this case presents one of those curious type records where no tes-

timony was taken, we need not stumble through to determine what is substantial evidence, *see Florida Peach Growers Association v. United States Department of Labor, supra,* since the critical element is wholly undisputed.

### On The Chattahoochee

Seaboard Coast Line Railroad (SCL) owns and maintains a bridge over the Chattahoochee River near Alga, Alabama. On April 26, 1962, a public hearing was held, pursuant to 33 U.S.C.A. § 513 [9], to determine if the railroad bridge was an unreasonable obstruction to navigation. After consideration of the evidence, the Secretary of the Army determined that the bridge was an obstruction and therefore ordered the railroad to alter the bridge providing a horizontal clearance of 150 feet normal to the channel and a vertical clearance of not less than 35.6 feet above ordinary high water. The order was subsequently amended to allow a 200 foot horizontal clearance. App. at 5. The total cost of the alteration would be apportioned between the railroad and the United States [10].

Proceedings under this section shall not operate as a stay of any order of the Secretary issued under provisions of sections 511 to 523 of this title other than section 516 of this title, or relieve any bridge owner of any liability or penalty under such provisions.

8. We have before us, without any objection from the Government, the appendix to the reply brief of SCL that contains photocopies of documents pertinent to the case and not certified by the Government. It is perfectly evident from the content of these papers that the record certified by the custodian of records was woefully inadequate. We have made full use of these documents.

9. *§ 513. Notice, hearings, and findings*
Whenever any bridge shall, in the opinion of the Secretary, at any time unreasonably obstruct such navigation, it shall be the duty of the Secretary, after notice to interested parties, to hold a hearing at which the bridge owner, those interested in water navigation thereunder or therethrough, those interested in either railroad or highway traffic thereover, and any other party or parties in interest shall have full opportunity to offer evidence and be heard as to whether any alteration of such bridge is needed, and if so what alterations are needed, having due regard to

the necessity of free and unobstructed water navigation and to the necessities of the rail or highway traffic. If, upon such hearing, the Secretary determines that any alterations of such bridge are necessary in order to render navigation through or under it reasonably free, easy, and unobstructed, having due regard also for the necessities of rail or highway traffic thereover, he shall so find and shall issue and cause to be served upon interested parties an order requiring such alterations of such bridge as he finds to be reasonably necessary for the purposes of navigation.

10. *§ 516. Apportionment of cost*
■ At the time the Secretary shall authorize the bridge owner to proceed with the project, as provided in section 515 of this title, and after an opportunity to the bridge owner to be heard thereon, [2] the Secretary shall determine and issue an order specifying the proportionate shares of the total cost of the project to be borne by the United States and by the bridge owner. [3] Such apportionment shall be made on the following basis: The bridge owner shall bear such part of the cost as is attributable to the direct and special benefits which will accrue to the bridge owner as a result of the alteration,

Plans for altering the bridge, which consisted of building a replacement span bridge, were tentatively approved by the Coast Guard[11] in November 1971, at an estimated cost in excess of 3 million dollars. App. at 7. Analysis of cost apportionment was also made at this time. According to plans, the replacement bridge would be built parallel to the old bridge approximately 200 feet to the south. The plans also included the relocation of 1.5 miles of communication wireline. The wirelines were parallel with and located on the south side of the existing tracks and bridge. They were not physically attached to the bridge structure and they crossed the river on self-supportive poles.

The plans, specifications, and apportionment of cost were subsequently revised to reflect bid prices of the low bidder. In May 1972, SCL submitted the revised plans to the Coast Guard estimating the total cost of the project to be in excess of 2 million dollars. The plans reflected the proportionate share of the cost to be borne by each party and included a line item for removal and relocation of the wirelines. On June 26, 1972, the Commandant of the Coast Guard approved and signed the Order Of Apportionment Of Cost providing for performance of the work.

The railroad began construction and discovered that if the wirelines were placed in the proposed (and approved) permanent relocation, the contractor would be hampered in completing the work on the approach embankment of the new bridge. Therefore, the plans were changed to allow temporary relocation of the wirelines. App. at 20, 21. SCL informed the Coast Guard on March 14, 1973, that the contract amount for the temporary relocation was $12,422.75. On April 3, 1973, the Coast Guard approved the contract as being reasonable. App. at 30. After approval of the temporary relocation of the wireline, there were several informal discussions and an on-the-site investigation of the necessity of relocating the wirelines permanently to the south side of the new bridge.

The Coast Guard took the position that the permanent relocation was not necessary since the existing wirelines were accessible to the railroad for maintenance purposes. In response to the Coast Guard's request to submit a new justification for the relocation, SCL claimed that the existence of a wireline crossing over each approach to the new bridge would hamper movement of cranes, derricks and pile drivers in the

including the expectable savings in repair or maintenance costs; and that part of the cost attributable to the requirements of traffic by railroad or highway, or both, including any expenditure for increased carrying capacity of the bridge, and including such proportion of the actual capital cost of the old bridge or of such part of the old bridge as may be altered or changed or rebuilt, as the used service life of the whole or a part, as the case may be, bears to the total estimated service life of the whole or such part: [4] *Provided,* That in the event the alteration or relocation of any bridge may be desirable for the reason that the bridge unreasonably obstructs navigation, but also for some other reason, the Secretary may require equitable contribution from any interested person, firm, association, corporation, municipality, county, or State desiring such alteration or relocation for such other reason, as a condition precedent to the making of an order for such alteration or relocation. [5] The United States shall bear the balance of the cost, including that part attributable to the necessities of navigation: [6] *And provided further,* That where the bridge owner proceeds with the alteration on

a successive partial bid basis the Secretary is authorized to issue an order of apportionment of cost for the entire alteration based on the accepted bid for the first part of the alteration and an estimate of cost for the remainder of the work. [7] The Secretary is authorized to revise the order of apportionment of cost, to the extent he deems reasonable and proper, to meet any changed conditions.

(Footnote numbers in brackets, e. g., [1], [2], added for convenience of reference.)

11. On October 15, 1966, the Department of Transportation was created by Pub.L. 89–670. Upon its creation, all functions, powers, and duties of the Secretary of Army relating generally to obstructive bridges were transferred to and vested in the Secretary of Transportation. The U. S. Coast Guard was also transferred to the Department of Transportation by Pub.L. 89–670, and the bridge administration functions of the Army Corps of Engineers were transferred to the Coast Guard. *See* 1966 U.S. Code Cong. & Admin.News, pp. 1101, 3362.

event repairs to the new bridge or removal of wrecks became necessary. The railroad further asserted that the wirelines were outside of the normally maintained right of way for a distance of more than a mile. Although the Coast Guard approved as necessary and paid the cost of temporarily locating the wireline, it refused to approve the permanent relocation maintaining that it was not a necessary part of the bridge relocation and was not necessary to eliminate an unreasonable obstruction to navigation.

In an effort to compromise, the Coast Guard agreed to approve the relocation of the entire wireline if SCL assumed the total cost of materials. App. at 35. The Coast Guard would pay labor costs of relocating that portion of the wireline which was moved to facilitate embankment construction. This compromise was unacceptable to SCL and no part of the permanent wireline relocation cost was paid by the Government.

In an order issued May 7, 1975, the Coast Guard[12] formally disallowed the permanent relocation expense holding that the relocation of the wireline was not an alteration made to meet the necessities of navigation and that the cost should not be borne by the United States.

The Government argues that it should not have to bear the cost of the permanent relocation since the alteration does not fall within the "necessities of navigation" requirement (§ 516[5], note 10, *supra*). SCL's position is that taking into account the reasonable needs of the railroad, the wirelines should be permanently relocated to the south side of the new bridge.

*Law Bound Not Fact Bound*

█ We do not have to decide which of these arguments should prevail. That decision obviously involves matters requiring expertise. The statute gives the decision-making duty to the Secretary, and he performed it, as shown in the formal order. The statute further provides a fairly elaborate process of allocation. When the allocation is finally translated in terms of dollars, on the estimated probable cost, and becomes a part of the Order of Apportionment, it is binding on both parties.

We reverse and hold that the permanent relocation of the wireline was a proper Truman-Hobbs expense and should be borne by the Government. The removal and relocation of the wireline was in the Order of Apportionment (see § 516[2], note 10, *supra*) approved by the Commandant on behalf of the United States Government. From the time it is in the Order, that is a final determination that the element is a part of the project and can no longer be questioned unless the Order itself is revised, and it can only be revised to meet changed conditions (§ 516[7], note 10, *supra*). There is not a shred of evidence in this record that shows any change of conditions or that the initial order was revised.

After the Secretary issued the order to alter the bridge, the railroad submitted its plans and specifications for the alteration. The plans, with the bids, were approved in a specific sum to a specific contractor and the force labor cost was approved.[13] These were not only approved but in the structure of the Order of Apportionment were direct-

---

**12.** For our purposes we assume this was final agency action, even though it was merely a letter from a Captain of the Coast Guard (the name is illegible), Chief, Civil Engineering Division, "By direction of the Commandant." App. at 58–59.

**13.** *§ 514. Submission and approval of general plans and specifications*

It shall be the duty of the bridge owner to prepare and submit to the Secretary, within ninety days after service of his order, general plans and specifications to provide for the alteration of such bridge in accordance with such order, and for such additional alteration of such bridge as the bridge owner may desire to meet the necessities of railroad or highway traffic, or both. The Secretary may approve or reject such general plans and specifications, in whole or in part, and may require the submission of new or additional plans and specifications, but when the Secretary shall have approved general plans and specifications, they shall be final and binding upon all parties unless changes therein be afterward approved by the Secretary and the bridge owner.

ly and precisely tied into the Order of Apportionment. The cost apportioned to SCL was $260,338 with the total of $30,000 for wireline removal apportioned to the Coast Guard.[14]

More significant, by letter dated 17 July 1972 (A–50), the Coast Guard approved the estimates and transmitted the original and copy of the Order of Apportionment signed by the Commandant, U.S.C.G. (A–52 to A–54) "specifying the proportionate shares of the total cost to be borne by the United States and the [SCL]". SCL was requested to sign and return a copy which was done on July 24, 1972.

Of decisive significance, this formal order fixed the precise amounts to be borne by each, SCL's portion being fixed at $260,338 (see A–37, note 14, *supra*):

> NOW THEREFORE, in accordance with the provisions of Section 6 of the Act of June 21, 1940, as amended (54 Stat. 497; 33 U.S.C. 511–523) it is hereby ordered that the proportionate share of the total cost of the United States shall not exceed $2,298,349 and the proportionate share to be borne by the Seaboard Coast Line Railroad Company shall not exceed $260,338 and the attached guaranty of cost is hereby approved. The apportionment of cost will not be revised as construction progresses; however, if, by reason of emergency, conditions beyond the control of the Railroad Company, or unforeseen or undetermined conditions, the total cost of the work exceeds the amount of the attached guaranty of cost, additional payments may be made pursuant to the provisions of Section 7 of the Truman-Hobbs Act, as amended.

**14.** In this reconstruction we use A–36 to A–48 "Apportionment of Cost Truman-Hobbs Analysis" and A–49 to A–59 in the appendix to SCL's reply brief since the Coast Guard woefully failed to certify these unquestioned official documents.

A–37 shows total cost to be apportioned at $2,212,745. Using the statutory and regulatory formulae with detail as to amount to be borne by the bridge owner to bottom line was:

```
Costs to be borne by the bridge owner....$226,381
     Contingencies 15%..................... 33,957
     Total................................$260,338
```

The plans approved and the Order of Apportionment defined for all time (except for changed conditions which are non-existent) that relocation of wireline was related to navigational needs and the amount was fixed at $30,000.

We hold that the issuance of the Order of Apportionment which included the wireline relocation locked that element into the project as a part thereof and it cannot now be refuted. The Order could not be changed except by formal revision under the only statutory standard of meeting changed conditions.[15] The record is absolutely barren of any showing of changed conditions. The only change is one in legal views by the Commandant's subordinates. From what we are able to discern, based on the documents before us, the Commandant has never amended his Order. It still stands. The record reveals a picture of engineers trying to sustain their presumably technical judgment that the element was not a part of the project, obviously based upon their untutored assumption of what the law requires. After the case was turned over to the lawyers, the lawyers support the engineers with an argument that this alteration cost was not attributable to the necessities of navigation. The argument may be a good one but it is certainly not evidence. And it is unpersuasive to us since it ignores altogether the fact and significance of the Order of Apportionment.

Upon review of the record before us and application of the statute, the permanent relocation of the wireline is an expense to be borne by the Government. The dollar amount is to be fixed by the Coast Guard on remand consistent with this opinion.

REVERSED and REMANDED.

A–44 "Total Estimated Cost Of Project" broke it down in broad categories, item 3 stating:

```
3. Communications, Railroad Force
   Account and Contract..................$30,000
```

A–46 "Estimate Of Cost" covers 32 items under "Construction Contract," 12 and 14 items under "Trackwork, Railroad Force Account (Joined or Welded Rail)" and A–48:

```
WIRE LINE CHANGES, RAILROAD FORCE ACCOUNT & CONTRACT

1. Relocate 1.5 Miles Wire Line    Lump Sum    $30,000
```

**15.** *See* note 10, *supra*.