**In the Matter of the VALUATION PROCEEDINGS UNDER §§ 303(C) AND 306 OF the REGIONAL RAIL REORGANIZATION ACT OF 1973.**

**Special Court
Misc. No. 76–1.**

Special Court,
Regional Rail Reorganization Act.

June 15, 1984.

---

Frazer C. Hilder, United States Railway Association, Washington, D.C., for United States Railway Association.

Stanley Weiss, Dean R. May, and Alexander Cohen, Carpenter, Bennett & Morrissey, Newark, N.J., for Central Jersey Industries, Inc.

Laurence Z. Shiekman, Kenneth I. Levin, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consolidated Rail Corp.

*CNJ Opinion on Interest and
Severance Damage*

Before Friendly, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

This court filed an opinion on July 12, 1983, *CNJ Opinion*, 571 F.Supp. 1269, and, on September 20, 1983, an opinion on reconsideration, *id.* at 1335, fixing the net liquidation value (NLV) of the Central Railroad of New Jersey (CNJ) (now, as a result of reorganization, Central Jersey Industries, Inc.), including the Lehigh & New England Railway. The latter opinion, *id.* at 1340, directed the parties to proceed as instructed by the final paragraph of the former, *id.* at 1335. This required them to indicate, at the time when a proposed judgment or proposed judgments were submitted,

> whether they agree that the court may take the net liquidation value as the base value of each certificate of value under § 306(c)(4) of the Act or whether either side desires to litigate the issues of the value of other benefits and compensable unconstitutional erosion as provided in §§ 306(c)(4)(B) and (C).

Central Jersey Industries, Inc. (CJI) filed a memorandum dated November 1, 1983. This took the position that although the parties were willing to agree that the values of other benefits and compensable unconstitutional erosion were zero (as had been done in the various settlements we have approved) and the case was therefore ripe for the entry of judgment fixing the base value of the certificates of value (CVs) under § 306 of the Rail Act, we must pass on three other issues before we could properly enter judgment under § 303 that the conveyance in exchange for the CVs was fair and equitable. These were:

(a) the severance damage caused to CNJ's retained Newark Bay Bridge property by the mandated conveyances;

(b) the constitutional insufficiency of the interest accruing at an 8% compound annual rate on the certificates of value; and

(c) the values transferred for ConRail's continued use which are not adequately measured by the net liquidation valuation standard called for in Section 306.

CNJ Memorandum In Support of Proposed Form of Judgment at 1.

On December 5, 1983, we entered an order finding that the total net liquidation value, within the meaning of § 306(c)(4) of the Rail Act, was $42,509,299 as of April 1, 1976 and, in accordance with the agreement of the parties, that the values of other benefits and of compensable unconstitutional erosion were zero. In an accompanying memorandum, also dated December 5, 1983, we explained how we have arrived at the figure. We also stated that

> [e]ntry of an order under § 306(c)(4) does not end our obligations with respect to CNJ in these proceedings; we must then enter an order under § 303(c).

We took note of the three points CNJ desired to raise, agreed with its concession that we had already rejected the third, and prescribed steps designed to assist us in formulating an order with respect to further proceedings under § 303(c). Although we had raised the question of our jurisdiction to consider CNJ's claims, both sides agreed that we had this. They relied upon § 303(c)(1)(A), which requires us to find whether the transfers or conveyances in exchange for the CVs "are in the public interest and are fair and equitable" to the transferor, and upon § 209(e)(1)(B), which gives us original and exclusive jurisdiction of any civil action "challenging the constitutionality of this Act or any provision thereof." [1] Our order established proce-

---

**1.** Although we agree that these provisions give us jurisdiction in the basic sense of power to pass upon CNJ's claims, we have remained troubled over the question of what remedy we could prescribe if we were to sustain them. Section 303(c)(2) states:

> If the special court finds that the terms of one or more exchanges for certificates of value and other benefits are not fair and equitable to an estate of a railroad in reorganization, or to a railroad leased, operated or controlled by a railroad in reorganization (taking

dures for the taking of further evidence, briefing and oral argument.

### "Fair and Equitable"

■ On three previous occasions we have addressed ourselves to the meaning of the phrase "fair and equitable" in § 303(c)(1)(A) and the related issue whether

> the Act involves a taking and, if so, whether the "constitutional minimum" required both by the terms of the Act and by the Fifth Amendment differs if the Act should be regarded as a reorganization statute enacted under the bankruptcy power or as a statute enacted under the commerce power or as both.

*CMV Opinion,* 445 F.Supp. 994, 999–1000 (1977). In our Memorandum and Order dated June 16, 1976, printed as an appendix to our opinion of October 18, 1976, 425 F.Supp. 266, 276, we noted the question, raised in our letter of March 9, 1976, which led to the Memorandum, what function these words served,

> especially in view of the facts (a) that if the consideration is "fairer and more equitable than is required as a constitutional minimum," § 303(c)(3) requires us to eliminate the excess, and (b) that if the consideration were less than the constitu-

tional minimum, it would not be fair and equitable.

*Id.* at 279. We went on to say:

> Almost all, perhaps all, the statements seem to agree that the fair and equitable language serves no significant function in the determination of the value of any particular property .... Accordingly the Court will consider the "fair and equitable" issue to have been removed from the process of valuing the properties of individual estates or other transferors unless this is raised in the briefs to be filed as above indicated; any person taking such a position shall state with precision and not merely in conclusory terms how the "fair and equitable" test differs from the constitutional minimum test with respect to valuation in the context of the Act as it now stands.

*Id.* In the October 18, 1976 opinion we said, to much the same effect, 425 F.Supp. at 269 (footnote omitted):

> Here again most of the parties share our inability to discern why, under the terms of the Rail Act, the requirement that we find that the consideration is more than, less than, or equal to the "constitutional minimum" does not drain the "fair and equitable" language of all meaning as regards the adequacy of the

---

into consideration compensable unconstitutional erosion, if any, which the special court finds to have occurred in the estate of each such railroad, during the bankruptcy proceeding with respect to such railroad), which has transferred rail properties pursuant to the final system plan, it may—

(A) enter a judgment reallocating the certificates of value in a fair and equitable manner if they have not been fairly allocated among the railroads transferring rail properties to the Corporation or any subsidiary thereof, except that one certificate of value shall be allocated to each such railroad; and

(B) if the lack of fairness and equity cannot be completely cured by a reallocation of the certificates of value, order the Corporation to provide for the transfer to the railroad of certificates of value issued by the Association as designated in the final system plan in such nature and amounts as would make the exchanges fair and equitable; and

(C) enter a judgment against the Corporation if the judgment would not endanger the viability or solvency of the Corporation.

Subparagraph (A), even if intelligible, would no longer be available since CNJ is the only transferor remaining. We have never been able to understand subparagraph (B), see *180 Day Appeals,* 384 F.Supp. 895, 929 & n. 64 (1974). This leaves subparagraph (C). Although it now seems likely that any judgment of the magnitude sought by CNJ "would not endanger the viability or solvency" of Conrail, we have characterized this as "a rather curious" remedy, *180 Day Appeals, supra,* 384 F.Supp. at 929, and Conrail strongly objects to our invoking it. Another possibility would be for us to declare that CNJ was constitutionally entitled to a certain amount in addition to NLV, and to leave that declaration to be enforced by a suit under the Tucker Act in the Claims Court, 28 U.S.C. § 1491; this too has its difficulties. In the light of our disposition on the merits, it becomes unnecessary to deal with the question of remedy.

total consideration to be received by each transferor.[2]

In our *CMV Opinion, supra,* 445 F.Supp. at 1000, we noted that the issue had

lost much of what once seemed to be its significance because of the concession of the Government parties (Brief at 12):

We do not contend that the Act cannot involve a "taking" or that the Fifth Amendment standard differs depending on which powers Congress invokes. *See also id.* at 14–15.

Since then the court and all the parties have proceeded on the basis that the fair and equitable standard of § 303(c)(1)(A) requires the "just compensation" mandated by the Fifth Amendment, neither less nor more. No one in these proceedings has argued to the contrary.

### The Interest Claim

Under the Rail Act, as enacted in 1974, Pub.L. No. 93–236, §§ 206(d), 303(a), (b), 87 Stat. 985, 996, 1005–06, transferors of rail properties pursuant to the Final System Plan (FSP) were to be compensated with securities of Conrail and obligations of the United States Railway Association (USRA), with any "short-fall" to be recovered by an action in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491, see *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 123–36, 148–56, 95 S.Ct. 335, 361–65, 42 L.Ed.2d 320 (1974). The Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, § 610(b), 90 Stat. 31, 104–05, amended the Rail Act so that payment was to be in "certificates of value", outlined in newly created § 306. The certificates of value were to be guaranteed by the Secretary of Transportation and to "constitute general obligations of the United States of America for the payment or redemption of which its full faith and credit are pledged", § 306(a). They were to be redeemed by USRA on December 31, 1987,

or on such earlier date as USRA's Board of Directors and Finance Committee might jointly specify, § 306(c)(1). The redemption price of each certificate was to be its "base value" on the redemption date less the sum of the fair market value of Conrail securities attributable to such certificate, cash dividends thereon, and another item not here material, § 306(c)(2). The base value was to be, § 306(c)(4):

the value obtained by (A) taking the net liquidation value, as determined by the special court, to which the transferor to whom such series of certificates of value is issued is entitled by virtue of transfers of rail properties, under section 303(b)(1) of this title to [Conrail] or a subsidiary thereof; (B) subtracting the value of other benefits provided under this Act, as determined by the special court; (C) adding such amount, if any, as the special court may determine shall be required after taking into consideration compensable unconstitutional erosion, if any, in the estate of a railroad in reorganization, of a railroad leased, operated, or controlled by such a railroad, which the special court finds to have occurred during any bankruptcy proceeding with respect to such railroad; (D) *adding interest from the transfer date to the redemption date to be compounded annually at a rate of 8 percent per annum;* and (E) dividing the resulting value by the number of certificates of value of such series distributed to such transferor. (Emphasis supplied.)

The Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 1167(b), 95 Stat. 357, 686, amended the provision of § 306(c)(2) requiring deduction for the value of Conrail securities, since these were now all to be owned by the United States. See S.Rep. No. 139, 97th Cong., 1st Sess.

---

**2.** We went on to say that we proposed to instruct the special masters who were then contemplated

that in valuing the properties they need not address themselves to the fair and equitable standard as distinguished from the constitu-

tional minimum in the absence of a specific and supported claim that a different result would ensue from application of such a standard, in which event the master shall seek this Court's further instructions.

425 F.Supp. at 270.

341, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 629.

> CNJ concedes that
>
> [a]t the time Section 306(c)(4) was enacted, early in 1976, the 8% rate of interest, compounded, was seemingly adequate.

CNJ Answer and Memorandum at 13 (Jan. 5, 1984) (footnote omitted). This concession is well-advised in light of the evidence that

> [t]en-year Treasury notes bearing 7⅞ percent and 8 percent respectively sold in May and August 1976 at or very near to face value (*see* Treasury Bulletin, May 1976 at V, August 1976 at V, 81; September 1976, at 72), and on March 31, 1976, the average yields of Treasury securities outstanding indicated a 7.7 percent return for securities maturing in 1987. *Id.*, April 1976, at 89.

GPs Reply in Support of Proposed Final Judgment at 26 n. 26 (Jan. 19, 1984). CNJ's claim is that what appeared to be a fair interest rate when the Rail Act was amended in 1976 has ceased to be so in light of the increase in such rates and that the allowance of only 8% interest, compounded annually, deprives it of the just compensation required by the Fifth Amendment for the delay in payment.

■ It is not disputed that when the Government takes property and defers payment, it must compensate the owner for the delay. In addition to the oft-quoted general statements in *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943) (footnote omitted), that the compensation provided by the Fifth Amendment "means the full and perfect equivalent in money of the property taken", citing *Monogahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893), and that "[t]he owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken", 317 U.S. at 373, 63 S.Ct. at 279 (footnote omitted), the Court said expressly in *Seaboard Air Line Railway v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 356, 67 L.Ed. 664 (1923):

> The requirement that "just compensation" shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. Where the United States condemns and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount to be added.

The Court has reaffirmed this very recently when it said in *Kirby Forest Industries v. United States,* — U.S. —, —, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984), that "if disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." See, to the same effect, *Phelps v. United States,* 274 U.S. 341, 47 S.Ct. 611, 71 L.Ed. 1083 (1927); *Shoshone Tribe v. United States,* 299 U.S. 476, 497, 57 S.Ct. 244, 251, 81 L.Ed. 360 (1937); 3 Nichols, The Law of Eminent Domain § 8.63, at 8–293 (Sackman rev. 3d ed. 1981).

CNJ's claim is that although the 8% annually compounded rate was fair when Congress provided for the CVs in 1976, things did not turn out that way, and therefore the Fifth Amendment requires that corrective action must be taken now. At oral argument on May 16, 1984, counsel for CNJ stated that Treasury bonds with rates and maturities nearly corresponding to those of the CVs were selling around 86; the differential between this figure and face value reflects the market's estimate how much 8% is less than a fair interest rate between May, 1984 and December 31, 1987.[3] Beyond this CNJ allegedly had suf-

---

**3.** In fact, the 86 figure is a yield to maturity, reflecting the upward pull of the certainty of the

fered a large loss in the differential between 8% and market rates of interest in many of the eight years since the conveyance.

In recent years, as a result of the explosion of interest rates, determination of the rate of interest constitutionally required in various types of taking has received increased attention from courts of appeals and the Court of Claims. This issue was not faced by us in our initial decision sustaining the constitutionality of the Rail Act, *180 Day Appeals*, 384 F.Supp. 895 (1974), or by the Supreme Court in the *Regional Rail Reorganization Act Cases, supra,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320, since, as noted, the form of compensation then provided was different.

*United States v. Blankinship*, 543 F.2d 1272 (9 Cir.1976), involved two takings by the United States in Oregon pursuant to the Declaration of Taking Act, 40 U.S.C. § 258a. That Act provides that title shall vest in the United States upon the filing in an appropriate court of a declaration of taking and deposit of the estimated compensation. When compensation is ultimately ascertained, the judgment

> shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court.

After reviewing Supreme Court decisions, including the *Miller* and *Seaboard Air Line Railway* cases cited above, the court of appeals concluded, in agreement with the district court, that "the Fifth Amendment under certain circumstances does require the use of a rate of interest in excess of 6 percent", 543 F.2d at 1274.[4] However, it disapproved the method by which the district court had computed rates of 8.5% for one parcel and of 8% for another. These had been reached on the basis of evidence pertaining to the commercial "prime rate", the rates applicable to three- and six-months certificates of deposit issued by certain Oregon banks, and ninety- and 180-day Treasury bills. The Ninth Circuit noted that this mix included "obligations not as riskless as those of the Treasury"; it believed that "the trial court should have focused more on that type of marketable public debt security which constitutes a direct obligation of the United States Treasury having a duration approximately the period during which the deficiency was unpaid." 543 F.2d at 1276. That, as we have seen, is exactly what Congress did with respect to the CVs; indeed, it provided for the annual compounding of interest, a factor with which the Ninth Circuit did not expressly deal. So viewed, the case would be an authority against CNJ, not for it. Operating somewhat against this, however, is the court's statement, *id.* at 1277:

> We also acknowledge that the marketability of a claim against the United States for a deficiency under the Declaration of Taking Act is considerably less than that of a marketable public debt security of the United States. Some al-

---

payment of the bond at face value on the maturity date.

**4.** It is not altogether clear whether the statement in *Blankinship* "that the 6 percent figure employed by Congress in the Declaration of Taking Act cannot be viewed as a ceiling on the rate of interest allowable in computing just compensation with respect to a deficiency", 543 F.2d at 1276, rested on an interpretation of 40 U.S.C. § 258a (including the canon of interpreting so as to avoid constitutional doubts, see, *e.g., United States v. Rumely,* 345 U.S. 41, 45, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953) (Frankfurter, J.)), or on a holding that the specification of a 6% interest rate had become unconstitutional. The

Court of Claims seems to have taken the former view, *Miller v. United States,* 620 F.2d 812, 837 (Ct.Cl.1980), discussed *infra;* see also *United States v. 329.73 Acres,* 704 F.2d 800, 812 (5 Cir.1983) (en banc); we would be inclined to take the latter. So, as we read its opinion, does the Supreme Court, see *Kirby Forest Indus. v. United States,* —— U.S. ——, —— n. 16, 104 S.Ct. 2187, 2194 n. 16, 81 L.Ed.2d 1 (1984). The same footnote tells us that the Government in its brief to the Court indicated that it has acquiesced in the decisions that the 6% rate provided in the Declaration of Taking Act is not a ceiling.

lowance for this feature by the trier of fact is not unreasonable.

In fact the marketability of the condemnee's deficiency claim against the United States would seem to have been nearly nil, since no one could know what the amount of the claim would be or when it would become due. In the former respect but not in the latter, the case is like CNJ's.

A few months later the Court of Claims decided *Pitcairn v. United States*, 547 F.2d 1106 (Ct.Cl.1976) (en banc) (per curiam), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978). This involved claims of an inventor for patent infringement by the United States, 28 U.S.C. § 1498, and the pertinent question was the fixing of appropriate rates of "delay compensation" on the royalty payments which it was determined the Government should have made over a long period from 1947 to 1975. In contrast to *Blankinship*, there was no applicable statute. A majority held that it was reasonable to divide the delay period into several periods and to fix rates rising from a low of 4% for 1947–1955 to a high of 7½ for 1971–1975. 547 F.2d at 1121. This was based on "evidence of record relating to the trends indicated by Moody's Composite Index of Yields on Long Term Corporate Bonds". *Id.* The court rejected the Government's claim that a more appropriate reference point was "the average annual yields of a series of hypothetical long term government bonds, in effect, the cost to the Government of borrowing money", as running counter to "the established rule of eminent domain that damages should be determined by what the condemnee has lost, not what the taker has gained." *Id.* at 1122. This reasoning overlooked the peculiar relevance of the yields on government obligations, which is what the claimant is given—however correct the actual decision may have been with respect to the "hypothetical" long-term bonds proffered as evidence. The reason why government bond yields are of peculiar relevance, as pointed out by Judge Sneed in *Blankinship*, 543 F.2d at 1276, and by Judge Skelton, concurring in part and dissenting in part in *Pitcairn*, 547

F.2d at 1128–30, is that they are free of the risk of default.

In *Tektronix, Inc. v. United States*, 552 F.2d 343, 352 (Ct.Cl.1977) (en banc), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978), the court directed that the *Pitcairn* rates be applied to all future just compensation cases "unless and until it is affirmatively demonstrated that under the theory of the *Pitcairn* opinion the rate for years after 1975 should differ from the 7½% rate set for 1971–75." Consistently with his opinion in *Pitcairn*, Judge Skelton, concurring in part and dissenting in part, would have remanded

> this part of the case to the trial judge with instructions to fix the interest rate for the periods in question according to the yield of Government obligations with duration approximating the periods of time from the date of each taking until paid, and that once the interest rate was determined for each taking, it would remain constant until paid.

*Id.* at 356.

In *Miller v. United States*, 620 F.2d 812 (Ct.Cl.1980), the Court of Claims was confronted with a case where, in contrast to the *Pitcairn* and *Tektronix* cases, Congress had provided, in the Act of Oct. 2, 1968, Pub.L. No. 90–545, § 3(b)(2), 82 Stat. 931, 932, 16 U.S.C. § 79c(b)(2), relating to the expansion of Redwood National Park, for a 6% rate of interest from the date of taking to that of judgment. The trial judge applied this, relying on the fact that at the time of the taking, October 2, 1968, "6 percent was in excess of the rate of interest paid by the United States Treasury on all governmental obligations regardless of term." 620 F.2d at 838. The court held this to be error, citing a number of cases, including the three just discussed, as showing "that the courts have looked to the interest rates prevailing in the years between the date of taking and the date of payment." *Id.* The court thought "[i]t would be possible for the courts to fix the interest rates received by any condemnee in the same manner as defendant suggests, *i.e.*, by reference to the prevailing rate of

interest at the time of taking", and also noted that "[a] superficial reading of Pub.L. No. 90–545 might indicate that Congress intended to establish a different treatment for redwood park landowners." *Id.* However, it perceived "a strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants" and therefore decided to "construe Pub.L. No. 90–545 as establishing the same manner of treatment for redwood park condemnees as that for other condemnees." *Id.* at 838–39. It went on to say, *id.* at 839 (footnote omitted):

> The keystone to defendant's argument in favor of limiting the rate of interest to 6 percent is its analogy of plaintiffs' situation to a person who has bought a Government obligation in 1968 at the then current interest rate of 6 percent. This analogy has several flaws. No reasonable investor would purchase an obligation with both an uncertain date of maturity and an uncertain amount of principal payable at maturity. Plaintiffs had their business property involuntarily converted into an extremely illiquid claim against the United States. Since plaintiffs' options for other investments were effectively cut off, just compensation in this case should include payments for delay of compensation measured by the interest rates prevailing between the taking and payment dates. The Government, not the unwilling condemnee,

should be the one to bear the risk of any fluctuations in interest rates.

The court applied the *Pitcairn* rates through 1975 but thereafter, taking judicial notice of Moody's rates for long-term Aaa corporate bonds, applied a rate of 8½% for the years 1976–1979 and of 12% for the year 1980 to the date of payment, although stating that the 12% rate would not be regarded as a precedent. *Id.* at 840. Apparently these rates were, as in *Pitcairn,* simple interest. The Court of Claims reaffirmed this approach in *Georgia-Pacific Corp. v. United States,* 640 F.2d 328, 365–67 (1980) (per curiam)—another Redwood National Park taking.

In addition to the criticism of use of long-term corporate bond yields made by Judge Sneed in *Blankinship, supra,* 543 F.2d at 1276, namely, that they do not reflect the risk-free character of government obligations, which the condemnee in effect held, resort to *any* varying long-term bond yields to measure "delay compensation" is subject to a more fundamental criticism if, as here, such yields climb from period to period.[5] This is that it would have been impossible for CNJ to shift from year to year from long term bonds with lower to higher rates as bond yields increased without incurring substantial capital losses.[6] Rather than pressing these lines of attack, the Government Parties (GPs) rely on the fact, not disputed by CNJ, that use of the *Pitcairn-Tektronix-Miller* approach of the Court of Claims would not produce delay compensation for CNJ significantly higher than the 8% com-

---

**5.** CNJ's proposed rates are:

| | |
|---|---|
| Apr. 1, 1976–Mar. 31, 1977 | 8.33% |
| Apr. 1, 1977–Mar. 31, 1978 | 8.20% |
| Apr. 1, 1978–Mar. 31, 1979 | 8.96% |
| Apr. 1, 1979–Mar. 31, 1980 | 10.21% |
| Apr. 1, 1980–Mar. 31, 1981 | 12.50% |
| Apr. 1, 1981–Mar. 31, 1982 | 14.08% |
| Apr. 1, 1982–Mar. 31, 1983 | 13.08% |
| Apr. 1, 1983–Dec. 31, 1983 | 8.64% |

For subsequent years, CNJ invites the court to refer to Moody's Composite Index on Yields on Long Term Corporate Bonds rate Aaa, which is the source of its proposed rates. See CNJ Answer and Memorandum at 23 (Jan. 5, 1984).

**6.** This seems to be the point made by Judge Skelton in his dissent in *Tektronix, Inc. v. United*

*States,* 552 F.2d 343, 356 (Ct.Cl.1977) (en banc), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978).

While CNJ brings to our attention that "following emergence from the CNJ reorganization proceedings in 1979 it placed its cash assets in short term instruments, principally bank CDs, with resulting average yearly yields ranging from 13.3% to 16.3% during the years 1979 to 1982", it recognizes that "[t]he courts, however, have not looked with favor upon determining the appropriate rate of interest on the basis of the individual claimant's circumstances or experience." CNJ Answer and Memorandum at 20–21 (Jan. 5, 1984). Beyond this, bank CDs are not risk-free.

pound interest provided for in § 306(c)(4)(D) unless it were to be supplemented by incorporating an element which the Court of Claims has declined to add, namely, compound rather than simple interest. In other words, acceptance of CNJ's proposal, rather than producing the uniformity which the Court of Claims deemed desirable, would place CNJ in a preferred class.

■ While eagerly embracing the Court of Claims' approach in other respects, CNJ says that in using simple rather than compound interest the Court of Claims has been wrong. It points out that interest payments on bonds are generally made semi-annually, thereby enabling the holder to earn interest on interest. For authority CNJ relies on *United States v. 429.59 Acres of Land*, 612 F.2d 459, 464–65 (9 Cir.1980). Compensation for a taking there was fixed by a Commission appointed under Fed.R.Civ.P. 71A(h), whose factual findings enjoyed the protection of the "unless clearly erroneous" rule, see Fed.R. Civ.P. 53(e)(2). The Commission found the appropriate interest rate for a period between May, 1971 and the time of its report to be 6.635% on the basis of average yields on a composite of four securities—six-month Treasury bills, four- to six-month prime commercial paper, ninety-day prime bankers acceptances, and six-month bank certificates of deposit. It then compounded that rate annually to arrive at a figure of 7.4% per annum. 612 F.2d at 465. The court held that the Commission had not clearly erred either in not considering government obligations with maturities greater than 180 days, as it had suggested in *Blankinship, supra,* 543 F.2d at 1274, or in compounding interest. With respect to the latter it said, 612 F.2d at 465:

Compounding of interest is appropriate to compensate the landowners for the loss of use of the interest that the deficiency award would have been producing for them during the interim.

*Contra, United States v. 97.19 Acres of Land,* 511 F.Supp. 565, 570 (D.Md.1981) (following Court of Claims' use of long-term corporate Aaa bond interest but declining to compound on the basis that "the Court of Claims formula adequately compensates a property owner for deprivation of the deficiency amount"). The most that CNJ can extract from *429.59 Acres, supra,* is that compounding of interest is not improper *when the interest yield has been computed on an appropriate basis.* We consider that, in the usual case, this would be either the yield on government bonds purchased at the time of the taking and maturing at the date of payment, as suggested by Judge Sneed for a majority in *Blankinship* and by Judge Skelton dissenting in *Tektronix,* with such adjustment, if any, as may be proper because of illiquidity, or yields on short-term government obligations.[7]

■ The first of these alternatives is what CNJ already has under § 306(c)(4)(D), subject only to the problem of marketability noted in *Blankinship.* We decline to consider the second since we do not subscribe to CNJ's thesis that, under the unique circumstances of this case, we can properly set aside the carefully considered determination of Congress, conceded by CNJ to have been reasonable at the time, that interest of 8% compounded annually constituted just compensation for the delay necessarily incident to the computation of the NLV and CMV of the railroads' properties.[8]

---

**7.** Any computation on the basis of yields available on short-term Government obligations would have to take into account the transaction costs on frequent roll-overs. These could not be avoided by purchasing shares in a money market fund holding only short-term government securities; the fund itself would have the transaction costs and would charge a management fee as well.

**8.** Although the legislative history does not inform us why December 31, 1987 was chosen as the maturity of the CVs, it is fair to assume that Congress thought it would take that long to fix just compensation. The thought was not unreasonable. If it had proved necessary to make a final determination as to all of the 23 railroads, including the giant Penn Central and its lessors, rather than as to only one, we would have been hard-pressed to complete the job by the end of

In saying this we recognize the famous statement in *Monongahela Navigation Co. v. United States, supra,* 148 U.S. at 327, 13 S.Ct. at 626, that

[t]he legislature may determine what private property is needed for public purposes—that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

*Accord, United States v. New River Collieries Co.,* 262 U.S. 341, 343–44, 43 S.Ct. 565, 566–67, 67 L.Ed. 1014 (1923). However, it does not follow from these general statements that when delay compensation is an integral part of a broad Congressional plan to preserve essential railroad service in the Northeast and to enable the bankrupt railroads in that region to receive billions of dollars from the Federal Treasury in compensation for properties whose operations were grinding to a halt, we are bound to treat the decision of Congress as if it did not exist. The decision was rational not only in the sense that 8% compound

interest on a government obligation with a maturity of eleven years and eight months was fair, as it concededly was, but in the broader sense that CNJ has adduced no evidence that anyone was then aware that interest rates would climb precipitously.[9] Moreover, the decision clearly was a considered one. Congress did not adopt the time-honored 6% simple interest provision of the Declaration of Taking Act, 40 U.S.C. § 258a; instead it provided a much more generous 8% compound interest rate. See S.Conf.Rep. No. 595, 94th Cong., 2d Sess. 140, *reprinted in* 1976 U.S.Code Cong. & Ad.News 14, 148, 155; H.R.Conf.Rep. No. 781, 94th Cong., 2d Sess. 140 (1976). When the New York Court of Appeals upheld the application of general statutory interest rates of 6% simple interest in condemnation cases, *County of Nassau v. Eveandra Enterprises, Inc.,* 42 N.Y.2d 849, 850, 397 N.Y.S.2d 627, 628, 366 N.E.2d 287, 288 (1977), saying, "[s]o long as the statutory rate constitutes a judicially acceptable, fair return for the deprivation of the use of that property or the money equivalent of that use, either or in combination, the statutory rate should be considered proper", the Supreme Court dismissed the condemnee's appeal "for want of substantial federal question." 434 U.S. 804, 98 S.Ct. 34, 54 L.Ed.2d 62 (1977).[10] This seems to

---

1987 even with the expedited procedures we have developed. In the settlements we have approved, USRA has not exercised its right to defer payment until December 31, 1987; we have no reason to doubt its willingness to follow the same course here once the amount payable to CNJ is determined.

**9.** To the extent that there was any such anticipation, it would, of course, have been reflected in the yields prevailing on April 1, 1976. In fact, as shown by CNJ's figures on long-term corporate bond yields, see *supra* note 5, yields in the period April 1, 1977—March 31, 1978, declined from those in the previous year.

**10.** The condemnee's proof in *Eveandra* was quite similar to that of CNJ's in the instant case. The condemnee asserted that the "prevailing and proper" interest rate for the period 1972–1977 was 9.75%. This position was supported by expert testimony: (1) a New York bank vice-president testified as to the prevailing prime rates of interest and the practices of banks in

the New York metropolitan area; (2) a Columbia University finance professor, after studying prevailing interest rates on borrowing and rates of return on investments during the period, testified that "the applicable rate is midpoint between average borrowing cost during [1972–1977] of 12 per cent per annum, and [New York] county's return on short term investments of 7.5 per cent per annum, which midpoint is 9.75 per cent per annum." Juris. Statement for Appellant, *County of Nassau v. Eveandra Enterprises, Inc,* No. 77–210, at 6. Thus, the condemnee asserted that "[t]his proof established the just compensation that [he] was entitled to by the Fifth Amendment made applicable to the Fourteenth Amendment," *id.* at 2, and stated that the Court's jurisdiction was based on 28 U.S.C. § 1257(2).

The New York Court of Appeals in *In re City of New York,* 58 N.Y.2d 532, 462 N.Y.S.2d 619, 449 N.E.2d 399 (1983) (per curiam), has recently characterized *Eveandra* as standing only for the proposition that the statutory 6% rate for the

us to apply *a fortiori* to a recently enacted statute designed to deal with a particular complex situation.[11]

As noted, we need not and do not go so far as to say that whenever Congress provides a rate of interest for delay compensation that is reasonable at the time of enactment, that rate necessarily remains so. This is not the ordinary case where government, for a public purpose, deprives a citizen of property which he would have preferred to keep for his own use. Continued operation was the last thing the railroads wanted; it was something they had neither the desire nor the ability to perform. See *CMV Opinion, supra,* 445 F.Supp. at 1017 (The railroads "have no desire to be put in a financial position that will enable them to build another railroad; they want to exit from the railroad business, not enter it."). The Rail Act, as we said in our first opinion, "was a Congressional response to the threat to the national welfare posed by the bankruptcy of the railroads in the northeastern United States .... These bankruptcies differed from earlier railroad insolvencies in an essential respect. Whereas earlier insolvencies had typically been caused by inability to meet fixed charges or

debt maturities, the causes of [the] railroad bankruptcies [of the late 1960's and early 1970's] in the northeastern region went much deeper; the roads were unable to pay taxes and operating expenses, even with substantial undermaintenance of plant which, in turn, led to revenue losses and increased expense, particularly for freight car hire." 384 F.Supp. at 902–03. Recognizing this, Congress made numerous provisions in the Rail Act, see *id.* at 909–10, granting financial aid to enable the railroads to keep alive between the date of enactment, January 2, 1974, and the date of conveyance, which turned out to be April 1, 1976. The desperate financial condition of these railroads is further detailed in our *CUE Opinion,* 439 F.Supp. 1351 (1977), and in our *Rail Use Opinion,* 531 F.Supp. 1191, 1215–17 (1981). Indeed the whole basis for the railroads' claim of compensable unconstitutional erosion was that the Rail Act postponed the dates when they would otherwise have ceased operation.

CNJ was not immune from the conditions affecting the other northeastern railroads. Indeed, it had been the first to enter bankruptcy, on March 22, 1967, and, for reasons outlined in our *CUE Opinion,*[12] its situa-

---

years 1972–1977 was not so "unreasonably low" as to deprive condemnees of just compensation given the fact that interest rates fluctuated around 6% during the period, *id.* at 538, 462 N.Y.S.2d at 627, 449 N.E.2d at 407, and approved the action of a trial court which, after reviewing economic reports showing that interest rates on medium term public securities "consistently rose far above 6% during the period 1978–1981," applied a median interest rate of 9% for that period in order to avoid using the statutory rate that had become so "unreasonably low", *id.* at 536, 462 N.Y.S.2d at 620, 449 N.E.2d at 400, saying that "the statutory rate is entitled to a presumption of reasonableness, not a presumption of constitutionality", *id.* at 538 n. 2, 462 N.Y.S.2d at 622 n. 2, 449 N.E.2d at 402. This may decrease but does not altogether remove the force of the Supreme Court's action in *Eveandra.*

**11.** What we have said here is not in direct conflict with *Blankinship, supra,* 543 F.2d at 1276, or *Miller, supra,* 620 F.2d at 837. *Blankinship* dealt with a 6% rate of interest provided in the Declaration of Taking Act, enacted in 1931, 46 Stat. 1421; this scarcely represented a considered judgment by Congress as to what would constitute a fair rate for a taking in 1973. The

*Miller* court, applying the principle of construing so as to avoid serious constitutional doubt, see, *e.g., United States v. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971), construed Pub.L. No. 90–545 as setting 6% interest as a floor rather than a ceiling, thereby leaving the courts free to require higher rates without having to declare the statute unconstitutional. We find it impossible to construe § 306(c)(4)(D) of the Rail Act to mean anything other than what it carefully and clearly says.

**12.** We there said, 439 F.Supp. at 1380:

CNJ was atypical in several respects. It carried a burden of commuter passenger traffic in the northern New Jersey metropolitan area which was huge in comparison with its total operations; its freight services were almost entirely those of a terminating or originating carrier; and we are told that its divisions with longer-haul carriers moving the traffic from and to the west were unfavorable—particularly the divisions in the Wilkes-Barre—Scranton, Pa., area.

See, to the same effect, *Rail Use Opinion,* 531 F.Supp. 1191, 1380 (1981):

tion in some respects was worse than that of other carriers. CNJ would doubtless respond that it was better off than other carriers in having a ready and willing purchaser, the State of New Jersey. However, as is implicit in our *CNJ Opinion,* 571 F.Supp. 1269, 1280–84 (1983), see also *Rail Use Opinion, supra,* 531 F.Supp. at 1382, the State would have taken full advantage of CNJ's lack of bargaining power. Indeed, CNJ's bargaining position with the State would have been peculiarly weak since the State was supplying the oxygen (in the form of subsidies) on which CNJ's life depended.[13]

Beneficial as the original Rail Act was to the affected carriers, the 1976 amendments made it even more so. One notable instance was the creation of the CVs as a means of payment in substitution for the limited amount of USRA obligations and Conrail securities provided for and the suit in the Court of Claims permitted by the 1974 Act for any excess of the value of the conveyed properties over the value of the allotted USRA obligations and Conrail stock. It was altogether legitimate for Congress, as part of such a comprehensive scheme, to fix the 8% compound interest which concededly appeared to be fair in 1976 as the amount of interest on the CVs. CNJ's plea for uniformity—more accurately for a preferred position, as we have shown—rings hollow in the context of the Rail Act, a unique piece of legislation designed to cope with a national emergency of unparalleled magnitude. If interest rates had declined, CNJ would hardly have agreed that the 8% compound rate made its compensation "more fair and equitable than is required as a constitutional minimum" under § 303(c)(1)(B). In this situation, unlike cases arising under the Declaration of Taking Act, 40 U.S.C. 258a, we see nothing in the just compensation clause that forbids us to accord appropriate respect to the fair and considered determination of Congress.[14]

### The Newark Bay Bridge

■ The Newark Bay Bridge (Bridge) is a structure built by CNJ under authorization from Congress in 1919, Act of Aug. 8, 1919, ch. 42, 41 Stat. 277.[15] A subsequent statute extended the period during which CNJ was to commence and complete construction, Act of Feb. 21, 1921, ch. 47, 41 Stat. 1099. The authorizing statute provided that the Bridge was subject to the Bridge Act of 1906 hereafter discussed. The Bridge spans lower Newark Bay for some 1.4 miles between Elizabethport and Bayonne, New Jersey. The Final System Plan (FSP) provided for the conveyance to Conrail of CNJ's tracks immediately to the west and east of the Bridge but left the

[CNJ] had not reported an annual profit since 1957; by 1973, it showed a negative net worth. It was in arrears on interline balances and on scheduled wage increases for its employees. It had already begun disposing of some of its facilities and operations; in 1971–72, it halted its New Jersey harbor lightering operations, its Jersey City coal dumping activities, its entire Pennsylvania freight operation, and its service on several small branch lines.

**13.** Although we have done our best to reconstruct the result that such bargaining would have produced, we have the gravest doubt that if Congress had not intervened with the Rail Act, CNJ, in the resulting chaos, could have realized $42,509,299 for the conveyed properties. For one thing, our estimate was predicated on the hypothesis that, although discontinuance of CNJ service was assumed, service by other carriers would continue, thus enhancing the value of CNJ's land and facilitating disposition of other assets. This would have been impossible but for the Rail Act.

**14.** We see no force in CNJ's argument that use of an 8% compound interest rate with respect to the CVs is unconstitutional because CNJ stipulated that the estimated proceeds of sale should be discounted back to April 1, 1976, at the rate of 15.22%, see 571 F.Supp. at 1294 n. 34. The 8% rate was reasonable when viewed *ex ante.* While we do not know how the 15.22% stipulated rate was arrived at, presumably it viewed the situation *ex post.* We likewise have given no weight to the GPs' argument that the 8% rate is validated by the fact that, under CNJ's reorganization plan, notes paid from proceeds of this case bear interest at 8%.

**15.** The Bridge replaced an older wooden structure constructed pursuant to an act of the New Jersey legislature, see 1860 N.J.Laws ch. 64.

Bridge itself with. CNJ.[16] As will be detailed below, the Coast Guard has decreed the Bridge to be a hazard to navigation and has ordered its removal. Since the Bridge is no longer used for rail purposes, the costs of this, estimated to be some $14,000,-000, will fall on CNJ, whereas if it had continued to be used for rail purposes, most if not all the cost would have been borne by the United States. CNJ contends that this removal cost constitutes "severance damage" for which it is entitled to just compensation under the Fifth Amendment. In order to evaluate the claim it is necessary to review the applicable federal bridge legislation and the history of this long-standing problem.

The right to erect or maintain a bridge across any navigable waters of the United States or to build anything in such waters, has always been "subject to the paramount right of navigation." *Union Bridge Co. v. United States*, 204 U.S. 364, 398, 27 S.Ct. 367, 379, 51 L.Ed. 523 (1907).[17.] Section 4 of the Bridge Act of 1906, ch. 1130, 34 Stat. 84, 85, 33 U.S.C. § 494, states:

> No bridge erected or maintained under the provisions of [this Act] ... shall at any time unreasonably obstruct the free

navigation of the waters over which it is constructed ....

The Government (Secretary of Transportation), "after giving the parties interested reasonable opportunity to be heard," may require the bridge owner to "alter the [bridge] as to render navigation through or under it reasonably free, easy, and unobstructed .... [A]ll such alterations shall be made and all such obstructions shall be removed at the expense of the persons owning or operating [the] bridge." *Id.* Section 18 of the Rivers and Harbors Act of 1899, ch. 425, 30 Stat. 1121, 1153-54, 33 U.S.C. § 502, provides criminal penalties for the willful failure of a bridge owner to comply with a lawful order "to alter the [bridge] as to render navigation through or under it reasonably free, easy, and unobstructed." Accordingly, until Congress enacted the Truman-Hobbs Act in 1940, "the owner of a bridge across a navigable stream was not entitled to any compensation for the alteration or removal of the bridge as a result of navigation needs." *Southern Railway Co. v. Tennessee Valley Authority*, 294 F.2d 491, 493 (5 Cir. 1961).

---

16. The FSP has this to say with respect to the Bridge, Vol. II, p. 215:

**Information for Line-Transfer Decision**
Bayonne shippers will continue to be served by ConRail via the existing Lehigh Valley bridge which is located 3 miles to the north of the CNJ bridge. Subsequent dismantling of the CNJ bridge will remove a serious navigational hazard for ocean shipping moving between Newark Bay and New York Harbor. Elimination of the bridge will, however, sever a lightly patronized suburban passenger service. (The State of New Jersey has expressed some interest in rerouting this service.)
**Disposition**
The Newark Bay Bridge is *not* designated for transfer to Consolidated Rail Corp.
*Continuation of passenger services using this bridge is dependent on the purchase, lease or other transfer of the necessary facilities to a public body.* (Emphasis in original.)
The deeds executed by the CNJ Trustee conveying to Conrail CNJ's rail property in Hudson and Union counties provided respectively:
The part of the line of railroad [excepted] begins at the lateral cut line in Bayonne and extends to the [Hudson] County line at the Newark Bay Bridge.

The part of the line of railroad [excepted] begins at the lateral cut line in Elizabethport and extends to the [Union] County line in Newark Bay.
CNJ-CRC-RP-7, at B-11; CNJ-CRC-RP-15, at B-2. CNJ's retention of the Bridge was subject to the following easement for commuter service, granted to Conrail, which was part of both deeds:
Subject to the easement and right to use ... the existing bridge or bridges, track or tracks, and track or tracks on such bridges, located on and across the [Newark Bay Bridge] for so long as passenger train service is operated to the City of Bayonne.
CNJ-CRC-RP-7, at B-11; CNJ-CRC-RP-15, at B-2.

17. In *Union Bridge Co.*, the Court held that the duty of a bridge owner to make alterations to eliminate an unreasonable obstruction to navigation and to bear all the costs, pursuant to the Secretary of War's order under § 18 of the Rivers and Harbors Act of 1899, ch. 425, 30 Stat. 1121, 1153, was not a taking within the Fifth Amendment.

On June 21, 1940, Congress enacted the Truman-Hobbs Act, ch. 409, 54 Stat. 497, 33 U.S.C. §§ 511 *et seq.*, in order to ease the financial burdens that the Bridge Act of 1906 imposed on railroad bridge owners. Applicable only to bridges "over navigable waters of the United States ... used and operated for the purpose of carrying railroad traffic, or both railroad and highway traffic," § 511, the Act covers Government-ordered "alteration[s]", defined as including "changes of any kind, reconstruction, or removal in whole or in part", *id.;* see § 516, and "relocation[s]", not defined in § 523. Pursuant to § 516, the cost of any alteration or relocation project is to be apportioned between the Government and the bridge owner as follows:

*The bridge owner shall bear such part of the cost as is attributable to the direct and special benefits which will accrue to the bridge owner as a result of the alteration,* including the expectable savings in repair or maintenance costs; and that part of the cost attributable to the requirements of traffic by railroad or highway, or both, including any expenditure for increased carrying capacity of the bridge, and including such proportion of the actual capital cost of the old bridge or of such part of the old bridge as may be altered or changed or rebuilt, as the used service life of the whole or a part, as the case may be, bears to the total estimated service life of the whole or a part .... *The United States shall bear the balance of the cost, including that part attributable to the necessities of navigation ....* (Emphasis supplied).

In other words, the Act "would impose on the Government the total cost incurred in the interest of navigation, with suitable apportionment of the cost to the railroad covering special improvements to the benefit of the railroad, the remaining useful life of the facility, and the like." *Seaboard Coast Line Railroad v. Coleman,* 562 F.2d 1008, 1010 (5 Cir.1977).

An order for "alteration" or "relocation" may be issued by the Secretary of Transportation (or his delegate, currently the Commandant of the Coast Guard) on making necessary findings and after complying with certain procedural requirements. See § 513. Any such order of the Secretary, however, must give "due regard ... for the necessities of rail or highway traffic thereover." *Id.* Orders issued under §§ 516 and 523 are subject to review by the United States Court of Appeals for the circuit where the bridge is located. See § 520.

The Bridge's location rendered it an obstruction to navigation, which became more serious with the expansion of shipping in Newark Bay. Numerous accidents had occurred; between 1951 and 1970, the Coast Guard recorded twenty-one collisions of vessels with the Bridge. A most serious collision in 1966 had "permanently damaged the easterly drawspan of the northern bridge," which was later removed. Exhibit GPS–BD (Feb.1982)–20, at 49–50.

In 1969 the Coast Guard, responding to a request from the American Institute of Merchant Shipping, began to investigate whether the Bridge was a navigational hazard. The preliminary investigation was conducted in preparation for proceedings under the Truman-Hobbs Act. The Coast Guard wrote the CNJ on September 5, 1969, asking about the latter's "long range plans" for the Bridge, referring CNJ to the Truman-Hobbs Act and explaining that under the statute, "if the bridge is determined by the Government to be obstructive and either alteration or replacement is directed, the federal government assists in the funding." Exhibit GPS–CNJ Bridge (Mar. 1984)–4. CNJ responded on October 29, stating that it had reviewed the procedures of the Truman-Hobbs Act and notifying the Coast Guard that the Bridge "is absolutely necessary [to CNJ's operations] for many years to come." Exhibit GPC–CNJ Bridge (Mar.1984)–5. The Coast Guard's preliminary investigation concluded "that the bridge might be an unreasonable obstruction to navigation" and recommended instituting formal hearings pursuant to § 3 of the Truman-Hobbs Act, 33 U.S.C. § 513.

See Exhibit GPS–CNJ Bridge (Mar.1984)–6, at 1.

In preparation for the hearing held in April, 1970, several Coast Guard officials met with their counterparts at CNJ on February 25, 1970. The Coast Guard explained the provisions of the Truman-Hobbs Act and discussed with CNJ the possible methods for improving clearances for ships passing under the Bridge. See Exhibit GPS–CNJ Bridge (Mar.1984)–7.

CNJ did not attend the April 1970 hearing, choosing instead to submit a letter from its chief engineer. That letter stated that "CNJ is in no position to assume any portion of the cost" of any alterations of the Bridge, and implied that CNJ intended to use the Bridge "in the foreseeable future". Exhibit GPS–BD (Feb.1982)–20, at 123. The Coast Guard's Report on the Obstructive Character of the Central Railroad of New Jersey Bridge Across Newark Bay, dated October 24, 1972, concluded that

> the bridge, as it stands, is an unreasonable obstruction to navigation and that there is a need and justification for its replacement. It is recommended that [CNJ] be ordered to alter its railroad bridge ... by replacing the existing bridge with a new bridge providing the required clearances, and to submit general plans and specifications for replacing the existing bridge .... The estimated cost is $14,267,700 of which amount the United States would pay $13,484,300 and [CNJ] $777,400 on the basis of apportionment of cost under Section 6 of the Truman-Hobbs Act.

Exhibit GPS–CNJ Bridge (Mar.1984)–8, at 1. The Report also estimated the total cost of a complete removal of the Bridge and rerouting of CNJ's traffic to the Penn Central-Lehigh Valley Bridge (PC–LV Bridge), see supra note 16, to be about $10,000,000. Id. at 13–14.

In January, 1971, Mr. Timpany, who had become the CNJ Trustee, reexamined CNJ's need for a separate bridge over Newark Bay. He concluded that CNJ's traffic should be rerouted to the PC–LV Bridge; this would permit removal of the Bridge. See Timpany (S) (Feb.1984) at 2. Negotiations then began with the Port of New York Authority (Port Authority), PC and LV and the Coast Guard, the inconclusive result of which will be discussed below.

Apart from the negotiations involving the Port Authority and PC and LV, the Coast Guard continued to try to resolve the Bridge problem with CNJ. On November 30, 1972, the Coast Guard notified CNJ that, pursuant to § 3 of the Truman-Hobbs Act, "it has been determined that [the Bridge] is considered to be an unreasonable obstruction to navigation of the navigable channel." The letter outlined the "proposed plan of alteration" and stated that "[a] preliminary apportionment of [the estimated project cost of $14,261,700] has been prepared ..., arriving at a tentative allocation of $777,400 to [CNJ] and $13,484,300 to the United States." The Coast Guard also explained that the apportionment of costs was based on an "exemplification of the principles of Section 6 of the Truman-Hobbs Act," a copy of which was enclosed, see Exhibit GPS–CNJ Bridge (Mar.1984)–1. Lastly, the Coast Guard noted that "[a]s an alternative to the foregoing plan consideration should be given to rerouting [CNJ's] rail traffic over the existing [PC–LV Bridge]," an alternative that "could be accomplished by an agreement under the provision of Section 13 of the Truman-Hobbs Act." Exhibit GPS–CNJ Bridge (Mar. 1984)–10.

CNJ responded on January 25, 1973, stating "[a]t the outset ... that in its present condition, CNJ has no funds available for participation in a project of the magnitude set forth in [the Coast Guard's Report], nor does it have access to any funds which would permit it to so participate." CNJ advised that its "present condition [is] that all interests would be best served if CNJ's rail traffic which presently traverses this bridge were transferred to the [PC–LV Bridge]." CNJ summarized its position as follows:

[W]e are in favor of rerouting of CNJ's traffic and the elimination of the obstruction to navigation provided that:

(1) no expense thereof be assessed against CNJ;

(2) CNJ would be permitted to sell the [Bridge], presently valued in excess of $4,200,000,

(3) CNJ would be reimbursed for any increased operating expenses resulting from the use of the [PC–LV Bridge],

(4) CNJ would also be reimbursed for any construction cost involved in making any necessary connections in order to operate over the [PC–LV Bridge].

Timpany (S) (Feb. 1984) Exh. 13.

The Coast Guard again wrote to CNJ on April 16, 1973, requesting additional information on which to calculate the costs of removing the Bridge and rerouting CNJ's rail traffic; the Coast Guard reiterated:

The costs of relocation of new construction … come under Section 13 [of the Truman-Hobbs Act] which provides that they should be apportioned between the bridge owner [CNJ] and the United States as provided in Section 6 (33 U.S.C. 516) of the Act.

Exhibit GPS–CNJ Bridge (Mar. 1984)-11.

CNJ responded on June 20, 1973, and repeated its position:

CNJ believes that it is in the best interest of all parties involved to eliminate [the Bridge], rather than replacing it with a wider span. However, [CNJ] must again emphasize … [that] [t]he completion of the project must depend solely on funds other than those of CNJ, and CNJ must be totally reimbursed for its increased operating expenses, including annual usage payments to the [PC and LV].

Exhibit GPS–CNJ Bridge (Mar. 1984)-12.

Another aspect of the Coast Guard's plan to remove or alter the Bridge concerned what to do with the existing passenger service. Ultimately, the administration of New Jersey's Governor Byrne concluded that such service could be replaced with bus service. Initially, Governor Cahill's ad-ministration, which had taken office in January, 1970, supported the proposal to shift CNJ's freight traffic to the PC–LV Bridge and indicated that "[a]lternative routes [for passenger service] may be completely acceptable to the [New Jersey] Department of Transportation both from a service and subsidy viewpoint." Timpany (S) (Feb. 1984) Exh. 8 (Letter from Robert J. Bussolt, Deputy Attorney General, New Jersey, to Robert L. Oswald, Secretary, ICC (Sept. 19, 1972)). Governor Cahill's loss in the June 1973 primary election prevented any action in the fall of 1973. See Timpany (S) (Feb. 1984) at 12; see also *CUE Opinion, supra,* 439 F.Supp. at 1382 & n. 56.

On July 12, 1974, the new Commissioner of Transportation, Alan Sagner, met with the Coast Guard and indicated that he wished to delay any decision on the commuter service until the fall of that year "to allow time for the completion of a transportation study." Exhibit GPS–CNJ Bridge (Mar. 1984)-16. Commissioner Sagner continued to withhold a decision about the commuter service across the Bridge until April, 1975, when he notified the Coast Guard of the State's conclusion "that the bridge should not be demolished". Timpany (S) (Feb.1984) Exh. 18. Three months later, however, in a meeting on July 11, 1975 with the Coast Guard and Port Authority, Commissioner Sagner agreed that the Bridge could be removed and bus service substituted for the commuter rail service. See Exhibit GPS–CNJ Bridge (Mar. 1984)-19. The parties also discussed the factor that "an abandonment of services across the CNJ bridge could possibly preempt employment of the Truman-Hobbs Act to solve the navigation problems caused by this bridge." *Id.* Thus, Sagner hoped that rail service over the Bridge would be maintained until action could be taken under the Truman-Hobbs Act.

Six months later, on January 27, 1976, in another meeting among the Coast Guard, the New Jersey Department of Transportation, the Port Authority and the FRA, Commissioner Sagner's Deputy, Stangl, reiterated that New Jersey was prepared "to provide alternate transportation systems

for the remaining passenger rail use of the CNJ bridge and intends to accommodate the removal of the bridge." Stangl also stated that the "State believes the Order to Alter (O/A) should be issued." Exhibit GPS–CNJ Bridge (Mar. 1984)-20. The participants recognized:

> [T]he total project cost [of removal] is some 12 million dollars. CNJ is still the legal owner of the bridge and under the law subject for their portion of the removal cost.

Moreover, they noted that action under the Truman-Hobbs Act might not be possible if an Order to Alter was not issued before the April 1, 1976 date of the start of Conrail's operations. See *id.*

In a meeting with the Coast Guard on February 13, 1976, Timpany stated that CNJ's response to an "Order to Alter" under the Truman-Hobbs Act would simply be that "we are broke". Exhibit GPS–CNJ Bridge (Mar. 1984)-21. He also indicated that CNJ considered the Bridge to be a $21 million asset and as the minutes of the meeting recite:

> At the conclusion of the meeting, it was evident that CNJ's position was that [it] wanted the bridge removed, but [it] also would be paid something for losing the bridge, which [it] considered an asset.

*Id.*

CNJ continued to provide passenger and limited freight service over the Bridge until April 1, 1976. At that time, pursuant to the FSP, CNJ's rail line in Elizabethport up to the beginning of the Bridge structure and CNJ's line in Bayonne within one half mile of the Bridge were taken by Conrail. The Bridge itself remained with CNJ, subject to an easement to Conrail for so long as Conrail conducted passenger operations over it, see Timpany (S) (Feb. 1984) Exh. 19; *supra* note 16. Pursuant to a subsidy arrangement with the State of New Jersey, Conrail operated passenger service over the Bridge until August 1, 1978.

On May 19, 1977, at which time the Bridge was serving passenger traffic, the Coast Guard, pursuant to the Truman-Hobbs Act, issued an "Order to Alter" to CNJ. The Order provided in pertinent part:

> [The Coast Guard] has determined that this bridge is an unreasonable obstruction to navigation; [The Coast Guard] directs The Central Railroad of New Jersey to alter this bridge by constructing one new movable span on the same general alignment as the existing bridge.... If desired, the Coast Guard will consider a relocation of this facility in order to facilitate a removal of the bridge from the waterway.

Timpany (S) (Feb. 1984) Exh. 20.

Once the Coast Guard learned of the decision to discontinue rail service over the Bridge, it advised CNJ that "[a]t such time as rail service terminates, the [Bridge] will ... not be a 'bridge' as that term is defined in the Truman-Hobbs Act. Accordingly, that Act will no longer be applicable." Instead, the Coast Guard would be forced to proceed under the Bridge Act of 1906, whereby the owner bears the entire expense of removal. The Coast Guard "reaffirm[ed] the determination made in 1972 that [the Bridge] is an unreasonable obstruction to free navigation" and informed CNJ that it has "determined that [the Bridge] should be removed when the present rail commuter service ceases." Thus, the Coast Guard notified CNJ of its "intention to issue an order for the removal of the bridge ... under the authority of section 4 of the Bridge Act of 1906, 33 U.S.C. 494." CNJ was given thirty days to respond to the proposed removal order. See Timpany (S) (Feb. 1984) Exh. 21.

CNJ did not respond. Instead, in July, 1978, it filed suit in the District Court for New Jersey seeking to enjoin the Coast Guard from proceeding under the Bridge Act of 1906. This was settled by an agreement dated June 11, 1979, supplemented by an agreement dated September 14, 1979. The pertinent provisions of the settlement were:

1) CNJ acknowledged that it was the owner of the Bridge within the meaning of the Bridge Act;

2) CNJ agreed that it would forego all further proceedings directed to review the Coast Guard's determination that the Bridge should be removed;

3) The suit in the District Court was to be dismissed without prejudice, and CNJ released any claim against the United States for inverse condemnation but expressly reserved its claim for severance damages;

4) The United States would remove the Bridge, using its best efforts to minimize expense, which included applying all salvage proceeds against such removal costs;

5) CNJ would recognize a claim by the United States against its estate for costs incurred in removing the Bridge, to be realized solely out of the proceeds CNJ would obtain in its valuation case, the claim to accrue interest at a compound annual interest rate of 8%.

Under CNJ's reorganization plan, which was approved by the District Court for New Jersey, *In re Central Railroad of New Jersey*, 473 F.Supp.. 225 (D.N.J.1979), CJI issued Series D 8% Contingent Notes to evidence the claim of the United States described above.

As indicated at the outset, CNJ's claim is that the failure of the FSP to provide for a taking of the Bridge, although taking the tracks adjacent on either side, inflicted severance damage in the amount of any sum which CNJ may be required to pay for removal of the Bridge.

The Supreme Court has defined severance damage as follows:

If only a portion of a single tract is taken the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract. Such damages is often, though somewhat loosely, spoken of as severance damages.

*United States v. Miller*, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943) (foot-note omitted). It had earlier stated in *Bauman v. Ross*, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed.2d 270 (1897), that "[w]hen the part [of a land parcel] is left in such shape or condition, as to be in itself of less value than before, the owner is entitled to additional damages on that account."

Lower courts have offered variations on this theme. In *Miller v. United States, supra*, 620 F.2d at 828, the court stated:

Severance damage, by its very nature, arises only on the taking of a portion of the owner's property and is directed at the diminution in value of the remaining portion not taken.

See *Coast Indian Community v. United States*, 550 F.2d 639 (Ct.Cl.1977) (per curiam) ("Severance damage has been legally defined as the deterioration in value of the owner's remaining property caused by the transfer of property rights to a part of the land.") The court observed in *United States v. 101.88 Acres of Land*, 616 F.2d 762, 767 (5 Cir.1980), that "[i]n a partial taking case ... the government impliedly agrees ... to pay for damages to the landowner's remaining land proximately caused by the taking itself, and by the use of the land taken." See also Jahr, Law of Eminent Domain—Valuation and Proceeds § 104, at 141 (1957); 4A Nichols, *supra*, § 14.01[3], at 14–38 to 14–39; 1 Orgel, Valuation under the Law of Eminent Domain § 53, at 252 (2d ed. 1953).

CNJ's case does not fall comfortably within the concept of severance damage as thus defined. The taking of the tracks east and west of the Bridge did not prevent use of the Bridge for rail service as a tearing up of the tracks would have done; indeed Conrail maintained passenger service over the Bridge under a subsidy arrangement with New Jersey for more than two years. The Bridge had long ceased to have value for rail use. It likewise had no value for nonrail use as that concept is normally applied, since the cost of removal considerably exceeded the scrap value.[18] CNJ's

---

**18.** This was conceded in various studies referred to in our *CNJ Opinion, e.g.,* the Wyer Dick Study, Exhibit CNJ-Timpany (Dec. 1978)–19, at 39–40; the DeLeuw Cather Study, Exhibit CNJ-

claim must be rather that the FSP decreased the likelihood of continued rail service over the Bridge and thus put removal costs under the regime of the Bridge Act for bridges not in rail service (owner pays all) rather than under the regime of the Truman-Hobbs Act for bridges in rail service (United States pays substantial portion), thereby transforming the value of the Bridge from zero to a large negative amount. However, CNJ was unable to continue operation over the Bridge without state subsidy, and any decreased likelihood of continued operation resulted not so much from the taking of the adjacent CNJ tracks as much as from the concentration in Conrail of the taken portions of CNJ and also of PC and LV, see *supra* note 16, thereby ending whatever small purpose the Bridge had served for freight traffic. It would go beyond any authority cited by CNJ [19] or known to us to hold that this came within the traditional concept of severance damage.

Although we could end our analysis at this point, the problem here presented is novel and we thus think it best to discuss the three principal arguments advanced by CNJ why it should be relieved of the bulk of the removal costs, without necessarily agreeing that any of them, if made out, would support an award for severance damage.

The first, insofar as we can understand it, is that if the Coast Guard had proceeded more speedily, the Bridge would have been altered or removed while it was still in rail service, with the Government bearing almost all the costs under the Truman-Hobbs

Act. If CNJ suffered any injury from the Coast Guard's delay, the injury was not from any taking or failure to take under the Rail Act. In fact our narrative of the events shows that responsibility for delay rests rather more in CNJ than in the Coast Guard. If CNJ had reacted favorably to the Coast Guard's seemingly fair alteration proposal of November 30, 1972, it would not have had the problem now confronting it. Instead, whether through necessity, obstinacy, or as a bargaining tactic, CNJ refused to accept responsibility for any part of the cost and even insisted on being paid millions of dollars for abandoning a patently worthless property.

CNJ's second argument is that but for the Rail Act it would have been able to conclude an arrangement whereby the Port Authority would have acquired the Bridge for $4 million and become responsible for its removal. We find that CNJ has not established this scenario on the facts and consequently have no occasion to decide what the legal consequences would be if it had.

CNJ's factual showing rests almost wholly on testimony by R.D. Timpany who, as stated, became its Trustee in January, 1971. We summarize this as follows:

Timpany had become aware of the Port Authority's strong interest in finding a way to eliminate the Bridge, which was a hindrance to the development of Port Newark. The PC–LV Bridge was adequate to serve CNJ freight traffic to and from Jersey City and Bayonne along with that of its owners'. Removal of the Bridge "even with the expenses associated with its pur-

Jacoby (Dec.1978)–57, at 30; the Peabody Study, Exhibit CNJ–Jacoby (Dec.1978)–62, at 48–49.

**19.** CNJ relies particularly on *State v. William G. Rohrer, Inc.*, 145 N.J.Super. 63, 366 A.2d 1017 (1976), *aff'd per curiam*, 161 N.J.Super. 561, 392 A.2d 162 (App.Div.1978), *vacated and remanded*, 80 N.J. 462, 404 A.2d 29 (1979). This is a classical case of severance damage. The State took part of a building in order to widen a highway; the cost of reconstructing the remainder of the building exceeded its value. Such novelty as there is in the case is the holding of the Supreme Court of New Jersey with respect to the remedy, namely, allowing the condemnee

the option of treating the condemnation as of the whole building. *Id.* at 468, 404 A.2d at 32. While pursuing this analogy would enable CNJ to thrust on Conrail ownership of the Bridge and consequent liability for removal costs, we find nothing in the just compensation clause authorizing us to require the Government to take property it does not want, as distinguished from requiring it to pay damages for injury which its taking has inflicted on property not taken. The Rail Act clearly puts decision as to what property is to be taken in USRA, not in this court.

chase from CNJ and the rerouting of CNJ traffic [over the PC–LV Bridge] was less expensive than alteration of the Bridge to eliminate the navigational obstruction and could be accomplished more quickly." Timpany (S) (Feb.1984) at 3. Both the United States and the Port Authority would benefit on this account, PC and LV would obtain added revenue, the State of New Jersey could substitute less expensive bus service for the existing passenger service over the Bridge, and CNJ would save the expense of operating over the Bridge and could realize badly needed cash. Timpany began the complex negotiations needed to achieve these ends and so informed the Federal Railroad Administrator on March 6, 1971. The negotiations began well. "The concept ... was that CNJ would sell the bridge to the Port Authority in return for a payment of $4,000,000 which was roughly the book value of the Bridge" and in addition the Coast Guard and the Port Authority were to reimburse it for the costs of building necessary connections to the PC–LV Bridge and operating over it. Timpany (S) (Feb. 1984) at 5. Timpany had a clear recollection that a mutually satisfactory arrangement was reached in principle between CNJ, the Port Authority and the Coast Guard and that progress was also made with respect to New Jersey's substituting bus for rail passenger service. However, after a promising start, negotiations with PC for use of the PC–LV Bridge broke down.

Despite this a meeting attended by Timpany and representatives of the Port Authority and the Coast Guard was held on May 24, 1972. Timpany recalled that at the meeting he advised

> the Coast Guard and Port Authority that the book value of the CNJ Bridge was approximately $4,000,000, that CNJ expected to be compensated in such amount for the Bridge .... the Coast Guard indicated at the meeting that it wished to proceed as quickly as possible under the Truman-Hobbs Act to negotiate with the parties in interest to achieve removal of the CNJ Bridge.

Timpany (S) (Feb. 1984) at 7. As a result the Coast Guard wrote Timpany on June 22, 1972 that it was interested in entering into negotiation with him, PC and LV, and the Port Authority "to determine if an agreement could be reached under Section 13 of the Truman-Hobbs Act." Timpany (S) (Feb. 1984) Exh. 5. However, negotiations had been moving slowly and by July, 1972, had reached a complete impasse. Consequently, on July 18, 1972, Timpany applied to the ICC for an order directing PC and LV to provide CNJ with operating rights over their bridge and related facilities. See Exhibit CNJ-Timpany (Dec. 1978)–22; GPs Reply In Support of Proposed Final Judgment Exh. 2 (Jan. 19, 1984). CNJ proposed to eliminate all its passenger traffic across the Bridge and to reroute its freight traffic across the PC–LV Bridge, which would have permitted "the subsequent dismantling of the CNJ bridge." Id. at 2. Although this proposal was opposed by PC and LV, see, e.g., Timpany (S) (Feb. 1984) Exh. 7 (LV's Protest filed Aug. 23, 1972), the New Jersey Department of Transportation notified the ICC that New Jersey was "in full accord and support of [CNJ's Application] since it would eliminate a bridge which is old and in need of repairs but also an impediment to navigation in the Newark Bay area." GPs Reply In Support of Proposed Final Judgment Exh. 3 (Jan. 19, 1984) (Letter from Robert J. Bussolt, Deputy Attorney General, State of New Jersey, to Robert L. Oswald, Secretary, ICC (Sept. 19, 1972)). Timpany caused these proceedings to be halted on February 13, 1973, at the request of other carriers which were exploring proposals by New Jersey and others to achieve a merger or other consolidation of facilities among Reading, LV and CNJ.

Timpany asserted that "[u]ncertainty was introduced into these efforts when Senator Hartke's Committee began hearings in February, 1973 on the northeast rail crisis, the start of the legislative process which eventually resulted in the Rail Act." Timpany (S) (Feb. 1984) at 9. On August 17, 1973, the ICC advised Timpany that in view of the lack of progress toward an

agreed solution it was considering a revival of the proceedings before it. However, essentially nothing more was achieved "in the brief period remaining before passage of the Rail Act ended all further efforts." *Id.* at 12.

This Port Authority scenario is reminiscent of the purchase by the State of New Jersey scenario which we rejected in the *Rail Use Opinion, supra,* 531 F.Supp. at 1378. We do not doubt that the Port Authority had serious discussions about playing some constructive role in the solution of the Bridge problem. We do doubt that the two Port Authority officials, now deceased, who are claimed by Timpany to have quickly acceded to his asking price of $4 million—Austin Tobin, its Executive Director, and Lyle King, its Director of Marine Terminals, in fact did so, as distinguished from listening politely to Timpany's presentation and not challenging it since doing so would have been premature until other pieces of the puzzle had been brought into place. Our experience, both before and after going on the bench, informs us that businessmen are all too prone to make the mistake of identifying silence of public officials or other businessmen with agreement. Moreover, despite Tobin's great influence in the Port Authority, its By-Laws in effect in the early 1970's show that he had no power to commit the Authority to any such major project as this. There was simply no occasion for the Port Authority to discuss price with Timpany so long as there were no arrangements for CNJ's use of the PC–LV Bridge. What brought the 1972 discussions to an end, as Timpany in effect concedes, was the owners' refusal to negotiate for CNJ's use of the PC–LV Bridge. What might have happened but for the Rail Act as a result of the ICC's reactivating in 1973 the proceeding that Timpany had brought in July, 1972, is altogether too speculative to afford a basis for recovery by CNJ.

CNJ's third scenario is that but for the Rail Act the State of New Jersey would have acquired the Bridge along with CNJ's other properties.

CNJ's argument takes off from a statement in the *Rail Use Opinion, supra,* 531 F.Supp. at 1379:

> The GPs make no attempt to show that any particular CNJ line or facility would not have been acquired.... In the absence of any evidence that any particular line would not have been acquired, we hold that the GPs have not rebutted CNJ's showing that its entire system would have been purchased for rail use.

The GPs respond with a statement earlier on the same page:

> We accept CNJ's contention that, in the absence of the Rail Act, New Jersey would have bought all of CNJ's *conveyed* properties. (Emphasis supplied.) [20]

The GPs assert that by saying this the court implicitly accepted testimony of Mr. Stangl, the former Deputy Commissioner of the New Jersey Department of Transportation, that New Jersey "would not have had any interest in, and would not have bought the Newark Bay Bridge." Stangl (S) (Nov. 1979) at 32.

The two quotations are not in fact inconsistent. Our statement that the State would have bought all the conveyed properties—the only ones that we were obliged to value (apart from any question of severance damage)—is not inconsistent with a belief that in fact New Jersey would have purchased all the properties. Our statement to the latter effect, which was not essential to the *Rail Use* decision, was in general reasonable enough. The discussions between CNJ's Trustee and the State had proceeded on the basis of the latter's purchase of all of CNJ's properties. There had been no segregation studies, and, again speaking in general, it would have been no great hardship for the State to purchase all rather than some since the purchase would have been made at a price at which the properties could be liquidated if found to be unnecessary for rail service. Since no issue concerning the Bridge was before us, there was no need for us to give specific

**20.** We quoted the phrase in the *CNJ Opinion,* 571 F.Supp. 1269, 1279 (1983).

consideration to Stangl's testimony, and we did not.

Now that the issue is before us, we see no reason for not crediting his testimony. As our statement of the facts shows, the State was thoroughly acquainted with the problems of the Bridge; it knew full well that if it bought the Bridge it would be saddled with all removal costs unless arrangements with the Coast Guard under the Truman-Hobbs Act could be concluded while the Bridge was still in rail service. Although no final decision had been made, it had long been clear that needed passenger service could be furnished by bus. CNJ argues that the State would have needed the Bridge in order to compete with other carriers for freight to and from the Bayonne peninsula and Jersey City. However, the State's interest was that the traffic be served, not in the carrier who should serve it. See Peabody Study, Analysis of CNJ Freight Traffic by Line Segment, Sept. 19, 1974, at 80, 1 CNJ Nonrail Use App. at 310 ("There is no traffic generated by [the Bridge] and it is not needed as a connection."). There is thus no sufficient reason to disbelieve Stangl's testimony that the State, whose main interest in the Bridge was in its removal as a hazard to navigation in Newark Bay, would not have purchased it at the risk of incurring a heavy liability by doing so.

Although this factual finding that the State would not have purchased the Bridge disposes of CNJ's third scenario, there are other defects in CNJ's argument.

Even if the State had included the Bridge in the properties to be purchased from CNJ, it does not follow that it would have paid a price that did not reflect what CNJ would be obliged to pay for removal of the Bridge if it ceased rail operation over it. In our *CNJ Opinion, supra,* 571 F.Supp. at 1279, we characterized our *CMV* and *Rail Use Opinions* as having broadly concluded that non-rail use value for the condemned properties "was the value that could be obtained by sale for the next most valuable use, namely, a break-up of the railroad and a sale of its component parts." This princi-

ple envisions a process in which the State, as a knowledgeable buyer, would have computed what CNJ could have realized from scrapping the condemned properties, including such costs as the sealing of tunnels, the levelling of embankments and the removal of bridges, and paid only the proverbial dollar more, see, *e.g., New Haven Inclusion Cases,* 399 U.S. 392, 437, 90 S.Ct. 2054, 2081, 26 L.Ed.2d 691 (1970); *CNJ Opinion, supra,* 571 F.Supp. at 1286. It was on this basis that we computed CNJ's non-rail use value in the *CNJ Opinion.* We see no reason to depart from this principle. If the State had purchased the Bridge along with the condemned properties, it would have insisted that full account be taken of the benefit it was thereby conferring by relieving CNJ of the burden of removing the Bridge at its own expense—a burden which CNJ would otherwise have been unable to unload. CNJ would have had no effective response to the State's demand for such a reduction in price. The only other way CNJ would have had to bring itself under the Truman-Hobbs Act, namely, by continuing the Bridge in rail service on its own account, was not open to it since it lacked the means to do this on a continuing basis unless heavily subsidized by the State.

CNJ argues against this that the State would not have taken such a harsh position, particularly since it would have been restrained by fear that if Timpany refused to sell at a price reduced by the anticipated cost of removing the Bridge, as he says he would have, the State would have been obliged to resort to condemnation and the New Jersey courts might follow the decision of the New York Court of Appeals, purporting in part to be applying New Jersey law, in *In re Port Authority Trans-Hudson Corp. (PATH),* 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734 (1967), *cert. denied,* 390 U.S. 1002, 88 S.Ct. 1244, 20 L.Ed.2d 103 (1968), discussed in our *CMV Opinion, supra,* 445 F.Supp. at 1027–29, and again in our *Rail Use Opinion, supra,* 531 F.Supp. at 1325–26. CNJ says, in effect, that the State would not have administered such tough medicine as to say that

the non-rail use value of its properties (which we have found to be $42,509,299 for the condemned properties) should be reduced in practical effect by as much as $14,000,000 less the value of any scrap obtained from the Bridge. However, this looks at only one aspect of the problem. If the State of New Jersey had purchased CNJ's properties with a view to continued operation over the Bridge, it would have been taking on an enormous burden in maintaining a heavily losing service for the indefinite future.[21] We thus would see nothing immoral in its insisting that the purchase price of the assets should be reduced to reflect a cost, even a very large one, that CNJ would have experienced on a scrap sale of its properties as a result of the Bridge Act, although the State would not incur it under the Truman-Hobbs Act if it continued a losing rail service over the Bridge. Putting the matter in a slightly different way, the Bridge was a $14 million albatross. CNJ could get rid of the bird only by (1) continuing operations over the Bridge, (2) moving them to the PC–LV Bridge and persuading the Coast Guard to treat this as a relocation so that the Truman-Hobbs Act would still apply, or (3) getting the State to continue them. The first possibility was excluded by CNJ's having become dependent on a state subsidy. The second had been blocked, at least for the time being, by the intransigence of PC and LV. This left only the third. If the State was to continue the operations at

heavy cost, it was entitled to ask that its service to CNJ be recognized by a reduction in the purchase price equivalent to what CNJ would have had to bear on a scrap sale. The albatross, after all, was CNJ's, not the State's. With respect to PATH, we add to our previous discussion only that the Hudson tunnels there at issue were a vital public service, "admittedly of great usefulness in the daily transportation of thousands of commuters", 20 N.Y.2d at 468, 285 N.Y.S.2d at 30, whereas the Bridge was of marginal usefulness—as witness the abandonment of already limited freight service in 1976 and of passenger service in 1978. There is thus serious doubt whether the rationale of PATH extends to the Bridge. Beyond that we adhere to the statement in our Rail Use Opinion, supra, 531 F.Supp. at 1326, which we quote for convenience in the margin.[22] Furthermore, if the State was seriously concerned that the New Jersey courts would follow PATH if it condemned the Bridge, New Jersey had the simple option of not condemning it. To be sure, this would have invited a claim for severance damage but, for reasons stated at the outset, we have the gravest doubt whether a failure to take which does not damage the untaken property except by lessening the chances of payment by the United States for its removal comes within that concept. Beyond this we have never found that if negotiations for the sale of CNJ's

21. We say this since the State could not have become party to an arrangement whereby the United States paid the bulk of the alteration costs under the Truman-Hobbs Act unless it had a bona fide intention of continuing operations. The State would have had no more assurance than CNJ that it would have been possible to work out a multi-party agreement whereby operations would have been routed over the PC–LV Bridge, with the United States paying most of the costs of relocation and removal.

22. While technically the New York Court of Appeals in PATH applied New Jersey law to the condemned property in New Jersey, all the court had to say on that score was that New Jersey law was similar to the general rule followed in New York and in the federal jurisdiction and that the case before it was sui generis, rendering it impossible to make with

certainty any statements predicting the reaction of the New Jersey Supreme Court. No New Jersey cases following PATH have been cited to us and we are not aware of any. Thus, there is no good reason to take the going concern value portion of the PATH opinion as indicative of what New Jersey courts would decide New Jersey's own law to be in the condemnation of the Ts' passenger lines. And there can be little doubt that public officials would not have paid such premiums by way of settlement for fear that a New Jersey court would follow the going concern value holding of PATH.... We thus need not rule on the GPs' argument that for this court to recognize a premium based on a state court's decisional law that is in conflict with federal condemnation law would violate principles of federal supremacy.

properties had collapsed, New Jersey would have condemned them; what the State would have done in that uncontemplated eventuality is completely uncertain.

In the *New Haven Inclusion Cases, supra,* 399 U.S. at 482, 90 S.Ct. at 2104, the Supreme Court said, although in a slightly different context, that a hopelessly losing railroad cannot be treated "as a liquidating enterprise with respect to certain items and as an operating railroad with respect to others, depending on which happens to yield the higher value." This seems to us a fairly appropriate characterization of CNJ's position with respect to the Bridge. It does not dispute that all its conveyed properties must be valued "as a liquidating enterprise". It seeks, however, to have the unconveyed Bridge valued "as an operating railroad" facility—operating at least long enough so that the Coast Guard would have been obliged to pay a substantial portion of the cost of its alteration or removal. We can understand CNJ's assiduity in asserting this, since the amount at stake is indeed large in relation to the NLV of the conveyed properties. But the Bridge problem has been with CNJ for years and we see no sufficient basis, as a matter of fairness, let alone as a matter of constitutional requirement, for shifting to the United States the cost of removing a hindrance to navigation which was on the brink of becoming useless for rail service when the discussions leading to enactment of the Rail Act began.

We accordingly propose to sign the final judgment attached to the GPs' memorandum of April 19, 1984. We shall defer doing this until the disposition of any petition for reconsideration which CNJ may desire to file. Any such petition must be filed within twenty days from the filing of this opinion.